UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STEPHEN CORBY KING, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. |
| | ) | 18-12037-JGD |
| DENIS R. McDONOUGH, Secretary, | ) | |
| Veterans Affairs; BRADLEY MAYES, | ) | |
| in his official and personal | ) | |
| capacities; and CASEY KVALE, in his | ) | |
| official and personal capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF DECISION AND ORDER ON
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

March 30, 2022

DEIN, U.S.M.J.

## I.  INTRODUCTION

Plaintiff, Stephen King ("Mr. King"), was employed as a Veterans Service

Representative at the United States Department of Veterans Affairs, Boston VA Regional

Office (the "VA") until his employment was terminated in December 2017, approximately one

year after he stopped performing any work for the VA, either remotely or in-person.  The

charges which led to his termination were *Failure to Follow Leave-Requesting Procedures* and

*Unauthorized Absence*.  Mr. King has brought this *pro se* action against Denis McDonough

("Secretary McDonough"), the Acting Secretary of the United States Department of Veterans

Affairs; Bradley Mayes ("Director Mayes"), Director of the Boston VA Regional Office; and

Casey Kvale ("Director Kvale"), Assistant Director of the Phoenix VA Regional Office

(collectively the "Defendants" or the "VA").  Mr. King alleges that he is disabled and that the VA failed to provide him with reasonable accommodations in violation of the Rehabilitation Act of 1973, as amended, 29 U.S.C. §§ 791 *et seq.* ("Rehabilitation Act"), that he was harassed and endured a hostile work environment after he engaged in protected activity, and that he was unlawfully terminated in violation of the Accountability and Whistleblower Protection Act of 2017 ("AWPA") because his employment was terminated while his complaint with the Office of Accountability and Whistleblower Protection ("OAWP") was pending.

This matter is presently before the court on the "Defendants' Motion for Summary Judgment" (Docket No. 86) pursuant to which the Defendants are seeking judgment in their favor on all counts of the Plaintiff's Amended Complaint (Docket No. 32) ("Compl.").  The Defendants contend, *inter alia*, that Mr. King has failed to establish a *prima facie* case of disability discrimination, and that even if he did, the undisputed facts establish that the VA did provide Mr. King with appropriate accommodations and that the VA had a legitimate, non-discriminatory reason for terminating his employment.  The Defendants argue further that the record does not support a finding that Mr. King was subjected to a hostile work environment or that his termination violated the AWPA.  Finally, the Defendants contend that, as a matter of law, Directors Mayes and Kvale are improperly named as defendants. After careful consideration of the record and arguments of the parties, and for the reasons detailed herein, the Defendants' Motion for Summary Judgment is ALLOWED.

## II. <u>STATEMENT OF FACTS</u>[1]

The court has carefully analyzed the statements of fact provided by the parties, and their responses thereto.  The record is construed in the light most favorable to the nonmovant – Mr. King.  <u>See</u> <u>Irobe v. United States Dep't of Agriculture</u>, 890 F.3d 371, 377 (1st Cir. 2018).  While Mr. King frequently "disagrees" with the Defendants' allegations of fact, in most cases he simply adds additional information, but does not actually dispute the veracity of the Defendants' allegations.  In response to other statements of fact he asserts that discovery is "missing," but he makes no affirmative challenge to the facts as presented, which are supported by affidavits, business records and other documentary evidence.  After a detailed review, this court has concluded that no material facts are in dispute.  The undisputed facts, viewed in the light most favorable to Mr. King, are as follows.

### <u>History of King's Employment with the VA</u>

Mr. King was employed by the VA as a Veterans Service Representative ("VSR") in the Boston Regional Office until his employment was terminated on December 22, 2017.  (DF ¶¶ 1, 63; Def. Ex. C at 1).  His job responsibilities included assisting veterans and adjudicating matters relating to disability and death compensation, pension programs, and education and

---

[1] The facts are derived from Defendants' Statement of Undisputed Facts in Support of Their Motion for Summary Judgment (Docket No. 88) ("DF") and the exhibits attached thereto ("Def. Ex."); Plaintiff's Response to Defendants' Motion for Summary Judgment (including his response to the Defendants' Statement of Undisputed Facts) (Docket No. 98) ("Pl. Resp."); Plaintiff's Statement of Undisputed Facts (included in his Response) (Docket No. 98) ("PF") and the exhibits attached thereto ("Pl. Ex."); Defendants' Sur-Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment (Docket No. 103) ("Def. Reply") and exhibits attached thereto ("Def. Reply Ex."); Defendants' Response to Plaintiff's Statement of Undisputed Facts (Docket No. 104) ("DR") and the Amended Complaint (Docket No. 32).  References to the Statements of Fact include the underlying record support.  Unless otherwise indicated, page citations are to the ECF page numbers.

vocational rehabilitation programs available to veterans.  (DF ¶¶ 6, 7; Def Ex. D at 85-91; PR

¶¶ 6-8).  During his employment, Mr. King participated in the VA's telework program,

pursuant to which he was allowed to work from home several days a week but had to

physically be in the office one day a week.  (DF ¶¶ 2-3; Def. Ex. C at 32; PR ¶¶ 2-3).  In order

to be rated "successful" in his VSR job duties, and to participate in the telework program, Mr.

King was required to complete an average of 6.0 "outputs" per day, as set forth in national

VSR performance standards.  (DF ¶¶ 8; Def. Ex. B at 4, 8).

Mr. King was suspended from the telework program on April 7, 2016, because he was

not meeting the minimum output requirement.  (DF ¶¶ 9; Def. Ex. A at 2; Def. Ex. D at 77-78).

Five days after his suspension, Mr. King requested a reasonable accommodation to continue

teleworking.  (DF ¶ 10; Pl. Ex. D at 2, n.2).  According to Mr. King, he needed to continue

working from home because his work environment was "too distracting" and noisy for his

attention deficit disorder ("ADD"). (Compl. at 6 ¶ d (Count IV); Def. Ex. D at 53-54).  While his

reasonable accommodation request was pending review, in July or August 2016, the VA

provided Mr. King with an alternative accommodation of noise-canceling headphones to

minimize the noise and distractions he had identified as the workplace limitation in his

request.  (DF ¶ 11; Def. Ex. D at 78).  Mr. King agreed to accept the headphones on the

condition that his request for telework be reconsidered if the headphones did not fit his

needs.  (Id.). [2]

---

[2] The Defendants consider this to be the first reasonable accommodation granted to Mr. King.
He denies that this was a reasonable accommodation because "[t]he formal VA form for reasonable
Accommodation was not completed at this time.  Therefore [he] could not accept the reasonable

On August 11, 2016, the VA conducted a performance evaluation in the critical performance-related elements of "Output" and "Quality" for all of the Veteran Service Center ("VSC") employees in the Boston office.  (DF ¶ 13; Def. Ex. D at 78).  The review covered all the VSC employees' cumulative performance for the fiscal year through July 2016, i.e., from October 2015 to July 2016 ("evaluation period").  (DF ¶¶ 13, 15; Def. Ex. D at 78, 105).  Based on the evaluation, Mr. King's average output was 5.63, 6.2% below the national performance standard.  (DF ¶ 15; Def. Ex. A at 2; Def. Ex. D at 79).  According to the VA, Mr. King's evaluation placed him among the three lowest performers within his division.  (DF ¶ 15; Def. Ex. D at 78-9).

Mr. King does not challenge these calculations, but instead claims, without evidence, that three "mitigating circumstances" invalidated his performance evaluation.  (Compl. at 7 ¶ 4 (Count IV); Pl. Resp. ¶¶ 13, 14).  First, Mr. King contends that he was placed on a new team that required a "training period," making him ineligible for evaluation.  (Id.).  He does not otherwise state when he was transferred to a new team, the duration of his alleged "training period," or the basis for his assertion that he was exempt from an evaluation.  (Id.).  Second, Mr. King contends that the "central office" told him that the incorrect evaluation period was used but failed to elaborate on the correct period.  (Compl. at 7 ¶ 4 (Count IV)).  Again, there is no record support for this assertion.  Lastly, Mr. King claims, without evidence, that the Veterans Benefit Management System has a memorandum of understanding with the American Federation of Government Employees which allegedly states that the evaluation

accommodations since the process was still proceeding."  (Pl. Resp. ¶ 11).  Mr. King does not deny receiving and accepting the headphones for use in the office.

period used was incorrectly applied to him.  (Pl. Resp. ¶¶ 13, 14).  The Defendants have

consistently taken the position that the output requirements applied to Mr. King.  (See, e.g.,

Def. Ex. B at 9; Def. Ex. D at 77-78).  In the absence of any challenge by Mr. King to the output

calculations performed in connection with the review of all VSC employees, as well as the

absence of any proof that Mr. King was somehow exempt from the evaluation, the court finds

that the undisputed facts establish that Mr. King failed to meet his output requirements

during the evaluation period.  (DF ¶ 15; Def. Ex. A at 2; Def. Ex. D at 78).

Based on the August 11, 2016 evaluation, Director Kvale recommended that Mr. King

and another underperforming VSR employee be placed on Performance Improvement Plans

("PIP").[3]  (DF ¶ 16; Def. Ex. D at 78).  Six days later, Mr. King met with his direct supervisor,

James Gaddy, and was placed on a PIP that went into effect on September 6 and lasted for

three months until December 7, 2016.  (DF ¶¶ 19-21; Def. Ex. D at 106).  According to the VA,

implementation of the PIP was intended to provide assistance to Mr. King in order to improve

his performance and was based solely on performance metrics.  (DF ¶¶ 22-23; Def. Ex. D at

80).

Two weeks after the PIP went into effect, on September 21, 2016, the VA reinstated

Mr. King's telework option because the noise-cancelling headphones did not meet his needs.

(DF ¶ 25; Def. Ex. D at 81).  Beginning on September 26, 2016, Mr. King was allowed to work

remotely three out of four days of the week and was to work in-office one day a week.  (DF

¶¶ 2, 28; Def. Ex. A at 2; Def. Ex. D at 81).  On the days he was teleworking, Mr. King was

---

[3] A third identified underperforming employee was already on an active PIP plan so no further
action was taken with respect to that individual.  (DF ¶ 16, n.2).

required to log on to his VA laptop and access the VA systems through the VPN.  (DF ¶ 3; Def. Ex. C at 32).  According to Mr. King, the VA discriminated against him by keeping him on the PIP after approving this reasonable accommodation.  (DF ¶ 68; Pl. Ex. A at 43).  However, Mr. King does not explain how allowing him to telework as requested was inconsistent with, or in any way impaired his ability to meet his output requirements.

The record shows that Mr. King's performance decreased significantly over his three month PIP period, even though he was allowed to telework in accordance with his requested accommodation.  (DF ¶¶  27, 28 ; Def. Ex. D at 81).  Specifically, his average daily output dropped from 5.63 to 2.96 over his PIP period. (DF ¶¶ 15, 28; Def. Ex. D at 81).  According to Mr. King, the reason his performance decreased was not due to his disability, but instead because he only received "training a few times" and the PIP was "designed for [him] to fail." (Compl. at 2 ¶ b (Count I); Pl. Ex. B at 2).  These excuses, however, do not explain why Mr. King's outputs decreased during the relevant period.

Towards the end of his PIP period, on November 14, 2016, Mr. King made his third and final reasonable accommodation request, this time for assistance with an application and interview process for a Quality Rating Specialist ("QRS").  (DF ¶ 29; Def. Ex. D at 110-13).  In his request, Mr. King claimed that his "ADD caused him to miss details," and hindered his ability to respond to interview questions fully.  (Def. Ex. D at 110).  After approving his third request, Mr. King received assistance with his application, was prepared for the interview, and was added to the list of eligible candidates for the position.  (DF ¶¶ 31-32; Def. Ex. D at 85).  Although he received the requested assistance, Mr. King contends that he was discriminated against because the VA did not log his disability into their system, which

allegedly would have enabled him to get "more credits" when applying for this position, and because he was never interviewed for the position.  (Compl. at 7 ¶ e (Count V)). [4]

### Circumstances Surrounding the Termination of Mr. King's Employment

The VA terminated Mr. King's employment for unauthorized absences, and for failing to follow leave-requesting procedures, after he failed to report for work—either in person or remotely—for nearly a year.  (DF ¶¶ 64-65; Pl. Resp. ¶¶ 64, 65).[5]  The last day Mr. King was physically in the Boston office was January 4, 2017, and he last logged on to the VA system on January 17, 2017.  (DF ¶ 4; Def. Ex. C at 32).  The relevant undisputed facts are as follows.

On January 4, 2017, Mr. King submitted an incomplete FMLA request to his supervisor, Brian Deery ("Mr. Deery").  (Pl. Resp. ¶¶ 51, 53; DF ¶¶ 51,53; Def. Ex. B at 5).  Mr. King had failed to indicate his dates of absence and the corresponding leave category on the appropriate form.  (Pl. Resp.¶ 53; DF ¶ 53; Def. Ex. B at 5).  The VA made a number of unsuccessful attempts to contact Mr. King to request the missing information, first by phone and then, following his request for only email communications, by email.  (DF ¶¶ 53-55).  However, he failed to respond.  (DF ¶ 55; Pl. Resp. ¶ 55).  As a result, on January 20, 2017, the VA timekeeper was instructed to code Mr. King's timecard as AWOL for the periods that were not clarified.  (DF ¶ 56; Def. Ex. D at 83).  Thereafter, Mr. King submitted medical documentation, dated January 17, 2017, apparently from his doctor.  (DF ¶ 57; Pl. Resp. ¶ 57).

---

[4] The evidence in the record is that Mr. King was not interviewed because the announcement for the position closed unexpectedly.  (DF ¶ 32 & n.5).

[5] The VA's leave policy is included in the VA Employee Handbook and supplemental policy.  (DF ¶¶ 33, 35).  Employees are required, in relevant part, to submit a leave request in advance, or as soon as practicable in the case of a need for an unscheduled leave, and to be present during duty hours unless they were on approved leave or excused absence.  (DF ¶¶ 33-37).

The short note stated in relevant part: "[i]n view of continued residual symptoms of his medical condition, I have advised that [Mr. King] take an additional 2 weeks medical leave from work with expected return date [of] January 30, 2017." (DF ¶ 57; Def. Ex. D at 114).

On January 27, 2017, Mr. King filed an EEO complaint alleging that he had been subjected to a hostile work environment based on his disability (Attention Deficit Disorder, anxiety and depression) and reprisal for prior protected EEO activity. (DF ¶ 67; Def. Ex. A at 2; Def. Ex. B at 3).  He complained of his having been placed on a PIP while his request for a reasonable accommodation (teleworking) was under review, and that the VA had refused to take him off the PIP after his accommodation was granted.  (DF ¶ 68; Def. Ex. A at 2; Def. Ex. B at 3).  He also challenged the sufficiency of the efforts undertaken to assist him in applying for the new position.  (Id.).  Instead of returning to work on January 30, 2017, in accordance with his doctor's note, Mr. King emailed his union representative stating that he was "unable to report for work" and requested that management be informed that his attorney should be included on any future correspondence with him.  (DF ¶ 58 & n.9; Def Ex. D at 82).[6]  As detailed below, Mr. King refused all subsequent efforts on the part of the VA to engage him in work.

According to Mr. King, he stopped reporting for work due to the "persuasive" nature of the harassment he endured during the one day of the week he was in the office.  (Compl.

---

[6] Although Mr. King asserts that his FMLA request was ultimately approved in February 2017 and that he requested administrative leave in the "summer of 2017," there is no record evidence supporting Mr. King's contention.  (See Compl. at 3 ¶ xii (Count I), 4 ¶ xv (Count I); Pl. Resp. ¶ 5).  Both the administrative proceedings initiated by Mr. King and the instant litigation have proceeded on the basis that he was never granted the leave requested in January 2017 and never returned to work thereafter.  (See Compl. at 3 ¶ xii (Count I), 4 ¶ xv (Count I); Pl. Resp. ¶ 5; DF ¶¶ 58,65 ; Def. Ex. B at 8; Def. Ex. D at 82-83).

at 6 ¶ c (Count III)).  Mr. King points to one incident that allegedly occurred on December 21,

2016, although the record suggests that the VA was not aware of his complaint until months

later.  (Pl. Ex. C at 1, 9).  According to Mr. King, he came into the office on December 21, 2016,

but left early after requesting leave.  (Compl. at 5 ¶ xvi (Count I); Pl. Ex. C. at 8).  As he was

attempting to exit the elevator to leave the building, Director Kvale placed his forearm in Mr.

King's path to prevent him from exiting, demanding an explanation as to why he was leaving

early (hereafter referred to as the "elevator incident").  (PF ¶ 5; Compl. at 5 ¶ xvi (Count I); Pl.

Ex. C. at 8).  According to Mr. King, Director Kvale felt empowered to confront him because

his union representative was on annual leave.  (Pl. Ex. C at 8).  No further details about this

alleged incident are provided, and it seems that the VA was unaware of the incident until

after Mr. King's employment was terminated.  (Pl. Ex. C at 9).  As detailed below, there is

some evidence that Mr. King called the VA Hotline on December 21, 2016 to complain about

this alleged incident.  (See PF ¶ 5).

Following Mr. King's failure to return to work on January 30, 2017, on February 8,

2017, Director Kvale notified Mr. King, in writing, that he would be considered AWOL until he

submitted clarification for his FMLA request and reminded Mr. King that the failure to submit

a proper leave request may lead to disciplinary action, up to and including, removal from

federal service.  (DF ¶ 59; Def. Ex. A at 3).  Mr. King added this letter to his EEO Complaint as

further evidence of discrimination, but took no steps to complete his FMLA request.  (DF ¶ 68,

n.11; Def. Ex. D at 31).  On April 28, 2017, Mr. Deery notified Mr. King that he intended to

admonish Mr. King for failing to follow leave procedures and failing to report for duty on April

11, 12, and 14, 2017, and that Mr. King had 14 days to respond to this notice.  (DF ¶ 38; Def.

[10]

Ex. C at 24-25).  Mr. King did not respond, as a result of which the charges in the proposed

admonishment were sustained and the admonishment was issued on May 26, 2017.  (DF ¶¶

39-40; Def. Ex. C at 21).  Despite the admonishment, Mr. King failed to report to duty in June

2017.  (DF ¶ 41; Def. Ex. C at 22).  On June 28, 2017, the VA sent Mr. King a letter notifying

him that he was required to return to duty within 10 calendar days, but Mr. King refused

delivery of the letter.  (DF ¶¶ 42-43).  After Mr. King again failed to appear when scheduled to

be on duty at the VA, Mr. King was notified by letter dated July 24, 2017, that it was being

proposed that he be suspended for fourteen (14) days.  (DF ¶ 45; Def. Ex. C at 16).  Mr. King

failed to respond, and he was suspended from September 16, 2017 through September 29,

2017.  (DF ¶ 46).

Despite the suspension, Mr. King did not thereafter report for work at the VA or log

into the VA network in October 2017, and he consequently was marked AWOL on his

timecard.  (DF ¶¶ 47-49; Def. Ex. C at 32-33).  On November 20, 2017, Mr. King was provided

notice of his proposed removal from the VA for failure to follow leave-requesting procedures

and because of his unauthorized absence.  (DF ¶ 61; Def. Ex. C at 4).  He was notified that he

had seven (7) days to respond, and a meeting was set for November 28, 2017.  (DF ¶ 62; Def.

Ex. C at 10-11).  Mr. King failed to report to the appointment, failed to request that it be

rescheduled, and failed to respond either orally or in writing to the notice of proposed

removal.  (Id.).  Consequently, the charges against Mr. King were sustained, and by notice

dated December 7, 2017, Mr. King was removed from his position effective December 22,

2017.  (DF ¶ 63; Def. Ex. C at 1).  Meanwhile, on November 22, 2017, the VA's Office of

Employment Discrimination Complaint Adjudication issued a Final Agency Decision rejecting

[11]

Mr. King's EEO complaint of discrimination and hostile work environment.  (DF ¶ 70; Def. Ex. B at 1).[7]

Instead of attending the meeting to discuss his termination from employment with the VA, on November 27, 2017 Mr. King filed a complaint with the OAWP alleging violation of "VA policy" and "retaliation."  (PF ¶ 2; Pl. Ex. C. at 7).  In the complaint, Mr. King alleged that Director Kvale's involvement in his proposed removal was in retaliation for his complaint about the elevator incident that had occurred almost a year prior.  (Pl. Ex. C. at 1, 82).  Mr. King did not otherwise make any whistleblowing allegations in his OAWP complaint.  (Id.).

While the complaint with OAWP was pending, on December 13, 2017, the VA received authorization from the OAWP to proceed with Mr. King's removal from employment with the VA.  (Def. Reply at 4-5; Def. Reply Ex 1 (Works Decl.) ¶¶ 6-8).  One day later, on December 14, 2017, Mr. King filed a complaint with the Office of Special Counsel ("OSC") raising, for the first time, whistleblowing allegations.  (Compl. at 10 ¶ b (Count VII); Pl. Ex. F; Docket No. 1 at 6, n.3).  The record, however, only contains a copy of the electronic filing notice and is otherwise devoid of documented evidence of the complaint, its allegations, and the resolution.  According to Mr. King, the OSC notified him that they would "not investigate [his] complaint." (Compl. at 10 ¶ d (Count VII)).

Shortly after the termination of his employment, on January 14, 2018, Mr. King filed an appeal to the Merit Systems Protection Board ("MSPB"), challenging the VA's decision to

---

[7] Mr. King appealed the final agency decision to the EEOC's Office of Federal Operations on December 11, 2017.  (DF ¶ 71).  In a decision dated August 14, 2019, the finding of no discrimination was affirmed.  (DF ¶ 71; Def. Ex. A at 1).

remove him.  (Def. Reply at 2).  Mr. King's appeal to the MSPB contained allegations of

reprisal for making whistleblowing disclosures and was ultimately dismissed as untimely.

(Docket No. 1 at 3, 6, n.3, 7; Pl. Resp. at 2).  On June 26, 2018, Mr. King filed a petition for

review with the United States Court of Appeals for the Federal Circuit seeking judicial review

of the MSPB decision.  (Docket No. 1, 12).  The matter was eventually transferred to this court

by agreement.  (Docket No. 6).

On February 8, 2018, the OAWP issued a decision upholding Mr. King's termination

and concluding that there was "no merit to the allegations that Mr. King's removal was due to

retaliation."  (Pl. Ex. C at 88).

Additional factual details relevant to this court's analysis are described below.

### III.  <u>ANALYSIS</u>

### A.  <u>Standard of Review – Summary Judgment</u>

"The role of summary judgment is 'to pierce the pleadings and to assess the proof in

order to see whether there is a genuine need for trial.'"  <u>PC Interiors, Ltd. v. J. Tucci Constr.</u>

<u>Co.</u>, 794 F. Supp. 2d 274, 275 (D. Mass. 2011) (quoting <u>Mesnick v. Gen. Elec. Co.</u>, 950 F.2d

816, 822 (1st Cir. 1991)) (additional citations omitted).  The record is viewed in the light most

favorable to the non-movant.  <u>Irobe</u>, 890 F.3d at 377.  The burden is upon the moving party to

show, based upon the discovery and disclosure materials on file, and any affidavits, "that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law."  Fed. R. Civ. P. 56(a).  "[A]n issue is 'genuine' if it 'may reasonably be

resolved in favor of either party.'"  <u>Vineberg v. Bissonnette</u>, 548 F.3d 50, 56 (1st Cir. 2008)

(quoting <u>Garside v. Osco Drug, Inc.</u>, 895 F.2d 46, 48 (1st Cir. 1990)).  "A fact is material only if

it possesses the capacity to sway the outcome of the litigation under the applicable law." Id. (quotations, punctuation and citations omitted).

"Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue." PC Interiors, Ltd., 794 F.Supp.2d at 275.  The opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts.  See LeBlanc v. Great Am. Ins. Co., 6 F.3d 836, 841-42 (1st Cir. 1993).  Thus, "once the movant has 'properly supported' its summary judgment motion, the nonmoving party must nevertheless 'set forth specific facts showing that there is a genuine issue for trial' and may not simply 'rest upon the mere allegations or denials of his pleading.'" Carrozza v. CVS Pharmacy, Inc., 992 F.3d 44, 56-57 (1st Cir. 2021) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986) (additional citations omitted)).

Applying these principles to the instant case, the Defendants' motion for summary judgment must be allowed.

**B.  Disability Discrimination Under the Rehabilitation Act**

Mr. King claims that the VA discriminated against him on the basis of disability by failing to reasonably accommodate him.  Specifically, Mr. King alleges that he was discriminated against by being placed on a PIP while his reasonable accommodation request was pending, keeping him on the PIP after approving his accommodation, and by not

[14]

providing sufficient accommodation for his application for the new QRS position.[8]  For the

reasons detailed herein, Mr. King has failed to establish a claim under the Rehabilitation Act.

### 1.  The Rehabilitation Act Generally: Standard of Review

The Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.*, and the

Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. §§ 701 *et seq.*, "prohibit

discrimination against an otherwise qualified individual based on his or her disability."

Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 19 (1st Cir. 2004).  "The Rehabilitation Act,

the precursor to the ADA, applies to federal agencies, contractors and recipients of federal

financial assistance, while the ADA applies to private employers with over 15 employees and

state and local governments."  Id.  Although the ADA does not apply to this case, "the case

law construing the ADA generally pertains equally to claims under the Rehabilitation Act."  Id.

In addition to prohibiting disparate treatment based on disability, the ADA and the

Rehabilitation Act "also impose an affirmative duty on employers to offer a 'reasonable

accommodation' to a disabled employee."  Id. at 19-20.  Thus, an employer must make

"reasonable accommodations to the known physical or mental limitations of an otherwise

qualified individual with a disability . . . unless such [employer] can demonstrate that the

accommodation would impose an undue hardship on the operation of the business[.]"

García–Ayala v. Lederle Parenterals, Inc., 212 F.3d 638, 647 (1st Cir. 2000) (citing 42 U.S.C. §

12112(b)(5)(A)).

---

[8] While the Counts of the Amended Complaint do not clearly identify the asserted cause of
action, Counts I, IV and V seem to raise claims of failure to accommodate Mr. King's alleged disability.
There is no Count II.

Where, as here, there is no direct evidence of disability discrimination, the plaintiff's claim is analyzed under the "three-stage burden shifting framework of <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792, 802-05, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." <u>Bangura v. Shulkin</u>, 334 F. Supp. 3d 443, 461 (D. Mass. 2018) (and cases cited). "Plaintiff has the initial burden to establish a prima facie case under this framework." <u>Boadi v. Ctr. For Human Dev., Inc.</u>, 239 F. Supp. 3d 333, 350 (D. Mass. 2017). To establish a prima facia disability discrimination claim under the Rehabilitation Act, Mr. King must prove by a preponderance of the evidence: (1) that he suffered from a "disability" within the meaning of the Act; (2) that he was qualified to perform the essential functions of the job, either with or without a reasonable accommodation; and (3) that, despite the employer's knowledge of his disability, the VA did not offer a reasonable accommodation. <u>Calero-Cerezo</u>, 355 F.3d at 20 (citing <u>Carroll v. Xerox Corp.</u>, 294 F.3d 231, 237 (1st Cir. 2002); <u>Higgins v. New Balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 264 (1st Cir. 1999)). As detailed below, the VA contends that Mr. King has not established a prima facie case, and this court agrees.

Assuming that Mr. King establishes a prima facie case of disability discrimination, the burden then shifts to the VA to articulate "a legitimate, non-discriminatory reason" for its adverse employment decision. <u>Boadi</u>, 239 F.Supp.3d at 350 (quoting <u>Ramos-Echevarría v. Pichis, Inc.</u>, 659 F.3d 182, 186-87 (1st Cir. 2011) (additional citation omitted)). Assuming the VA puts forth such a reason, the burden then shifts back to Mr. King "to show that the employer's justification is mere pretext cloaking discriminatory animus." <u>Boadi</u>, 239 F. Supp. 3d at 350 (quoting <u>Ramos-Echevarría</u>, 659 F.3d at 187 (additional citation omitted)). "Although intermediate evidentiary burdens shift back and forth under this framework, the

[16]

ultimate burden of persuading the trier of fact that the defendant intentionally discriminated

against the plaintiff remains at all times with the plaintiff." Reeves v. Sanderson Plumbing

Prods., Inc., 530 U.S. 133, 143, 120 S. Ct. 2097, 2106, 147 L. Ed. 2d 105 (2000) (internal

quotations omitted).  As detailed below, the VA has put forth a legitimate, non-discriminatory

reason for its decision to terminate Mr. King's employment, and the record does not support

Mr. King's contention that the reason was pretextual.

**2.  The Plaintiff Has Not Established a Prima Facie Case of Discrimination**

**a.  Mr. King Has Not Established That He Was Disabled Under the Act**

Under the Rehabilitation Act, an "'individual with a disability' (is defined) as 'any

person who . . . has a physical or mental impairment which substantially limits one or more of

such person's major life activities' or 'has a record of such impairment' or 'is regarded as

having such an impairment.'" McDonough v. Donahoe, 673 F.3d 41, 46 (1st Cir. 2012)

(quoting Rolland v. Potter, 492 F.3d 45, 47 (1st Cir. 2007); quoting 29 U.S.C. § 705(20)(B)).[9]  To

qualify as "disabled" under the Rehabilitation Act, a three-part analysis is applied.

McDonough, 673 F.3d at 46 (quoting Ramos–Echevarría, 659 F.3d at 187–88).  "First, the

plaintiff must establish that [he] suffers from an impairment.  Next, the plaintiff must show

that the impairment affects a major life activity, and third, that the impairment substantially

limits the major life activity." Id. (citations omitted).  "Major life activities are basic activities

of daily life that an average person in the general population can perform with little or no

difficulty[.]" Ramos–Echevarría, 659 F.3d at 187.  These include, but are not limited to,

---

[9] Mr. King contends that he actually has an impairment.  He does not argue that the VA regarded him as having an impairment.  See Ramos–Echevarría, 659 F.3d at 187.

"[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, interacting with others, and working[.]"  29 C.F.R. § 1630.2(i)(1)(i) (2012).  The "phrases 'substantially limits' and 'major life activities' must be strictly interpreted to create a *demanding* standard for qualifying as disabled." Rolland, 492 F.3d at 47 (internal quotation and citation omitted).  In order "to qualify as a disabled person under the Rehabilitation Act, an individual must have a permanent or long term impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Id. at 47–48 (internal quotation and citation omitted.)

The record establishes that the VA terminated Mr. King's employment because he failed to report to work – either in person or remotely—for nearly a year, and he failed to follow leave-requesting procedures.  (See DF ¶¶ 64, 65).  In denying Mr. King's EEO complaint, the Office of Employment Discrimination did not address whether Mr. King had set forth a prima facie case because it determined that the VA had articulated legitimate, non-discriminatory reasons for its employment decisions.  (Def. Ex. B at 8).  Assuming, *arguendo*, the issue whether Mr. King qualified under the Act is reached, this court concludes that he has not met his burden of establishing that his ADD rendered him disabled under the Rehabilitation Act.

The record shows that during the time Mr. King was employed with the VA, his ADD caused him to "miss details" and "get distracted easily."  (Compl. ¶ d; Def. Ex. D at 54).  Even when viewed in the light most favorable to Mr. King, under the facts presented here this does

not constitute "a substantial limitation on a major life activity." Calef v. Gillette Co., 322 F.3d 75, 86 (1st Cir. 2003) (employee with ADD who had difficulty concentrating failed to establish under the facts presented that he was disabled under the ADA because he was substantially limited in major life activities of learning or speaking).

Mr. King has made no effort to identify how his medical condition substantially limited a major life activity. "Merely pointing to a diagnosis of ADHD is inadequate." Id. Nor has he addressed whether he was able to compensate for any impairment. See id. at 85 (court held that it is required to "take into account the plaintiff's 'ability to compensate for the impairment'" and found that the plaintiff compensated for his ADHD through Ritalin and counseling) (quoting Albertson's, Inc. v. Kirkingburg, 527 U.S. 555, 565, 119 S. Ct. 2162, 144 L. Ed. 2d 518 (1999)). The record is similarly devoid of any evidence indicating that Mr. King's impairment was long-term or permanent, or that any impact on a major life activity was substantial. Rather, the evidence in the record establishes that Mr. King could perform his job when he elected to do so. In sum, Mr. King has not met his burden of proving that he is disabled under the Rehabilitation Act.

**b.  Plaintiff Has Failed to Establish He was Qualified
to Perform the Essential Functions of His VSR Position**

Mr. King's Rehabilitation Act claim must fail for the additional reason that he has failed to establish that he was qualified to perform the essential functions of his job. Under the Rehabilitation Act, an employee claiming a disability must demonstrate that they were able to perform the essential functions of their job with or without a reasonable accommodation. Calero-Cerezo, 355 F.3d at 20. "An essential function is 'a fundamental job duty' of the employment position" and while "[t]he term does not include 'marginal functions of the

position,' . . . it 'may be more encompassing than such core job requirements as an

employee's technical skills and experience even including such individual or idiosyncratic

characteristics as scheduling flexibility.'"  Ward v. Massachusetts Health Research Inst., Inc.,

209 F.3d 29, 34 (1st Cir. 2000) (quoting Laurin v. Providence Hosp., 150 F.3d 52, 57, 59 n.6

(1st Cir.1998) (internal punctuation omitted)).

     Mr. King has failed to establish that his medical condition precluded him from

obtaining his "output" requirements and, in fact, he did meet his goals on various occasions

even with his medical condition.  (See DF ¶ 14).  Additionally, even if it were assumed that Mr.

King was disabled and that his disability affected his job performance, his outputs dropped

from 5.63 to 2.96 while he was permitted to telework.  This poor performance supports the

conclusion that he was not able to perform the essential functions of his job even with a

reasonable accommodation.

     Even more importantly, Mr. King's failure to do any work for almost a year establishes

that he was not qualified to perform the essential functions of his job.  Whether "a regular

and reliable schedule" is an essential element of a specific job may require a fact-intensive

inquiry.  Ward, 209 F.3d at 35.  Here, however, the undisputed facts establish that Mr. King

refused to communicate with the VA about any leave periods he needed and refused to do

any work for almost a year.  Under these facts, Mr. King's extended leave was "too long to be

a reasonable accommodation and no reasonable factfinder could conclude otherwise[.]"

García-Ayala, 212 F.3d at 649; see also id. at 650 (and cases cited) (request for leave of

absence deemed unreasonable where an employee gave no indication as to when she might

be able to return to work, or where employee's absences were "erratic" and "unexplained").

[20]

Since Mr. King has not met his burden of proving that he was qualified for his job, with or without an accommodation, he has failed to establish a prima facie case of discrimination.

### c.  The VA Offered a Reasonable Accommodation

Finally, Mr. King has not established a prima facie case of disability discrimination because the undisputed facts establish that the VA did offer him a reasonable accommodation.  In response to his contention that the work environment was too distracting, the VA provided him with headphones.  When those did not solve the problem, he was permitted to telework, which was the accommodation he requested.  When Mr. King claimed to need assistance with applying for a new position, he was provided with that assistance.  (DF ¶¶ 31-32).  While Mr. King complains that what was done was not enough because he did not get the new job, there is no evidence in the record that the new position would be a valid accommodation for Mr. King's alleged disability.  Nor does Mr. King dispute that the VA provided him with assistance in applying for the job.  Consequently, Mr. King has not met his burden of proving that, despite the employer's knowledge of his disability, the VA did not offer a reasonable accommodation either in connection with his output requirement or in applying for a new position.  Calero-Cerezo, 355 F.3d at 20.  For all these reasons, Mr. King's Rehabilitation Act claims must fail.

### 3.  VA Had a Legitimate Nondiscriminatory Reason for its Adverse Employment Action

Even assuming *arguendo* that Mr. King has made out a prima facie case of discrimination, which this court does not find, his claim of discrimination must fail because the VA has offered a legitimate nondiscriminatory reason for placing and keeping him on a PIP

[21]

and for his ultimate termination.  As to his termination, the record is clear that Mr. King's

employment was terminated for failing to follow leave-requesting procedures and due to his

unauthorized absences for approximately a year.  (DF ¶¶ 64, 65).  Mr. King nevertheless

contends he should not have been placed on a PIP while his telework request was pending,

and that he was discriminated against by being kept on the PIP after the VA approved his

request.  These arguments are not persuasive and do not defeat the VA's legitimate reasons

for terminating his employment.

Deficient job performance and severe absenteeism are legitimate, non-discriminatory

reasons for an adverse employment action.  See Tobin v. Liberty Mut. Ins. Co., 433 F.3d 100,

105-06 (1st Cir. 2005) (holding that performance deficiencies, including failure to meet

minimum standards, missing meetings with supervisors, and substandard performance

evaluations, constituted legitimate, nondiscriminatory reason for adverse employment

decision).  Here, despite numerous opportunities to engage with the VA, Mr. King ignored his

employer and failed to do any work.  The VA has met its burden of proving a non-

discriminatory reason for its termination of Mr. King's employment.

### 4.  Mr. King Has Not Met His Burden of Proving Pretext

"If the employer offers a non-discriminatory reason, the burden then shifts back to the

plaintiff to show that the employer's justification is mere pretext cloaking discriminatory

animus." Ramos–Echevarría, 659 F.3d at 187.  "[P]retext means more than an unusual act; it

means something worse than business error; pretext means deceit used to cover one's

tracks." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008) (quoting Ronda-

Pérez v. Banco Bilbao Vizcaya Argentaria, 404 F.3d 42, 45 (1st Cir.2005) (internal quotations

omitted)).[10]  No such showing has been made here.

Courts have recognized "that pretext can be demonstrated through a showing that an

employer has deviated inexplicably from one of its standard business practices."  Kouvchinov

537 F.3d at 68 (citing Brennan v. GTE Gov't Sys. Corp., 150 F.3d 21, 29 (1st Cir.1998);

Lattimore v. Polaroid Corp., 99 F.3d 456, 466–67 (1st Cir.1996)).  The undisputed facts here,

however, defeat any such finding.  Following the performance review on August 11, 2016, the

other low performing VSR employees were placed on (or were already on) a PIP designed to

increase their outputs.  (DF ¶ 16 & n.2).  The VA followed its procedures in terminating Mr.

King's employment by providing him with notice, progressive discipline, and various

opportunities to report back to work.  The termination of Mr. King's employment was

consistent with the previous removal of another VA employee in his work unit who had also

committed a second unauthorized absence offense.  (DF ¶ 72).  Thus, there is no evidence

that Mr. King was treated differently than other VA employees.

Nor is there any other evidence of pretext.  Mr. King complains that he should not

have been put on a PIP while his request for accommodation was pending, and that he should

not have been kept on the PIP after he was allowed to telework.  As an initial matter, Mr.

King's treatment is consistent with VA policies. (Def. Ex. D at 56 ("[Director Kvale] stated that

[Mr. King] was not removed from a PIP as the agency is required to measure performance for

---

[10] While Kouvchinov is an ERISA case, the standard for establishing pretext is the same for
federal discrimination claims, as evidenced by the Kouvchinov court's citation to Ronda-Pérez, an age
discrimination case.

all employees regardless of their telework status"); Def. Ex. G at 7 ("Performance

improvement plans would still be implemented with an employee with a reasonable

accommodation request")).  Moreover, the fact that the VA was working with Mr. King to

ensure that he had an appropriate environment in which to work does not indicate that the

VA's treatment of him was a pretext for discrimination.  There is simply no link between

granting Mr. King's request to work from home and then – eventually – terminating his

employment when the number of his outputs deteriorated substantially and then stopped all

together.

 "The Rehabilitation Act is designed to put individuals with disabilities on equal footing

with non-disabled people in regards to the hiring, promotion, and discharge decisions of the

federal government and its grantees.  It is not designed to insulate them from disciplinary

actions which would be taken against any employee regardless of his status."  Wilber v.

Brady, 780 F. Supp. 837, 840 (D.D.C. 1992) (cited with approval in Leary v. Dalton, 58 F.3d 748,

753 (1st Cir. 1995)).  Thus, Mr. King has not met his burden of proving that the non-

discriminatory reason given by the VA for terminating his employment was pretextual.

 For all of these reasons, Mr. King's claims of discrimination must fail.

### C. Hostile Work Environment

 Mr. King claims he endured a hostile work environment that was so "persuasive that it

affected all [his] work with the VA." (Compl. at 6 ¶ c).[11]  The record does not support this

conclusion, and summary judgment in favor of the VA is warranted on these claims.

---

[11] Mr. King's claims of harassment were raised in Count III ("Hostile Work Environment") and Count VI ("VA Anti-Harassment Policy") of his Amended Complaint.

In order to succeed on a hostile work environment claim under the Rehabilitation Act, a plaintiff must show the following: (1) he is disabled as defined under the Rehabilitation Act, (2) he was subjected to uninvited harassment, (3) his employer's conduct was based on his disability, (4) the conduct was so severe or pervasive that it altered the conditions of his work and created an abusive work environment, and (5) the harassment was objectively and subjectively offensive. McDonough, 673 F.3d at 46. As detailed above, Mr. King has failed to establish that he was disabled under the Rehabilitation Act. This alone defeats his hostile work environment claim. Id. at 50. Even assuming, *arguendo*, that Mr. King has established a prima facie case of discrimination under the Act, the record does not support a finding of a hostile work environment.

In determining whether there is sufficient evidence for a jury to conclude that Mr. King was subject to a hostile work environment, the court examines "all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Vega-Colon v. Wyeth Pharmaceuticals, 625 F.3d 22, 32 (1st Cir. 2010) (quoting National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 116, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002) (additional citation and internal punctuation omitted)). While the inquiry is fact specific, summary judgment is appropriate where no reasonable factfinder could find in the plaintiff's favor. Vega-Colón, 625 F.3d at 32-33. This is one of those situations.

To the extent Mr. King alleges that he was subjected to harassment he relies primarily on the elevator incident, alleged unaddressed complaints of harassment on the part of

Director Kvale, and the denial of his FMLA request.  As to the elevator incident, while it was apparently upsetting to Mr. King, the record evidence is that it was an isolated incident that did not involve a physical confrontation.  Director Kvale allegedly just stopped the elevator door from closing.  Moreover, this incident allegedly took place on December 16, 2016, and Mr. King never appeared for work at the VA again.  Therefore, it cannot form the basis of a hostile work environment claim to explain his failure to work remotely.  The denial of Mr. King's FMLA request and the steps the VA took to communicate with him also do not support a finding of a hostile work environment.  The VA phoned Mr. King, and when he requested that all further communications be by email, the VA agreed.  A few letters were appropriately sent by mail.  There was nothing untoward in the VA's conduct.  Finally, there is no record support for the vague allegations of improper conduct by Director Kvale.  Courts have recognized that even "a litany of petty insults, vindictive behavior, and angry recriminations" do not rise to the level of an actionable hostile work environment claim.  See Bhatti v. Trustees of Boston Univ., 659 F.3d 64, 74 (1st Cir. 2011).  The instant record does not even rise to that level of negative conduct.  Mr. King has failed to establish that a hostile work environment existed, or that it interfered in any way with his work performance.[12]  Therefore, his claims of hostile work environment must be dismissed.

---

[12] The only other "negative" conduct described in Mr. King's papers is that in November 2017 and December 2017 the Boston Regional Office of the VA allegedly sent an email about Mr. King's employment status which contained a picture of a sloth named "Flash" from the Disney movie Zootopia working at a desk.  (PF ¶ 12; Pl. Ex. A at 99, 183).  There is no context for this allegation and no indication as to who, if anyone, this cartoon character was intended to represent.  Since the email communications were not directed to Mr. King, and allegedly were sent almost a year after he had stopped doing any work, these communications cannot be viewed as evidence that subjected Mr. King to a hostile work environment.

**D.  Retaliation**

Although there is no specific claim in his Amended Complaint that purports to state a claim of retaliation, a generous reading of Mr. King's pleadings indicates that he believes that Director Kvale retaliated against him after he called the VA harassment hotline complaining about the elevator incident on December 26, 2016 (PF ¶¶ 5, 8, 17; Pl. Ex. C at 8), and after he filed an EEO "Formal Complaint of Employment Discrimination" on January 27, 2017 challenging the fact that he had been put on a PIP while his request for accommodation was pending, that he was not taken off the PIP even after his request for accommodation was approved and he was permitted to telework, and the VA's conduct in connection with his request for reasonable accommodation in applying for the new position.  (Def. Ex. A at 2).  He subsequently amended the EEO charge to challenge the February 8, 2017 action characterizing him as being AWOL and allegedly threatening him with the termination of his employment.  (Id.).  A claim of retaliation may be pursued "even if the underlying claim of disability fails."  Soileau v. Guilford of Maine, Inc., 105 F.3d 12, 16 (1st Cir. 1997).  To prevail on this claim, Mr. King must establish (1) that he was engaged in protected conduct; (2) that he experienced an adverse employment action; and (3) that there was a causal connection between the protected conduct and the adverse employment action.  Calero-Cerezo, 355 F.3d at 25.  Even assuming that Mr. King is purporting to state a claim for retaliation under the Rehabilitation Act, that claim must fail.

The hotline call and the filing with the EEO may be considered protected activities. However, here, Mr. King was placed on the PIP due to his performance while he was teleworking, and well before the hotline complaint.  There can be no causal connection

between the PIP and Mr. King's disability, since he was working from home during the period

in question, which is the accommodation he believed he needed due to his alleged disability.

Similarly, the fact that he was kept on the PIP after he was authorized to telework cannot

have been in retaliation for his hotline complaint or EEO complaint, since they had not yet

occurred.  The same is true with respect to the assistance he was given to apply for a new job,

as that occurred in November 2016 and the protected activity first occurred in December

2016.

The fact that Mr. King was not granted FMLA leave cannot be attributed to his EEO

complaint.  Assuming that this is considered an adverse employment action and that Mr. King

has set forth a *prima facie* case of retaliation, an issue this court does not reach, the record is

clear that the VA went to great lengths to obtain information from Mr. King, and to give him

the opportunity to provide additional information and/or return to work.  The fact that he

declined to avail himself of these opportunities leads to the inescapable conclusion that there

was an objective, non-discriminatory explanation for why he was not given FMLA leave – he

never fully applied for it.  See Calero-Cerezo, 355 F.3d at 26 ("Once the plaintiff has made a

prima facie showing of retaliation, the McDonnell Douglas burden-shifting approach is

employed, and defendant must articulate a legitimate, non-retaliatory reason for its

employment decision.").  Mr. King has not put forth any evidence from which a factfinder

could conclude that "the proffered legitimate reason is in fact a pretext and that the job

action was the result of the defendant's retaliatory animus."  Id.

Finally, and for the reasons discussed more fully above, the termination of Mr. King's

employment cannot be attributed to his filing of any workplace-related complaints with any

agency.  His failure to perform any work for almost a year precludes a finding that his

employment was improperly terminated.  Thus, there is no basis for any claim of retaliation.

### E.  <u>Alleged Violation of the Accountability and Whistleblower Protection Act of 2017</u>

In Count VII of his Complaint, Mr. King alleges that his employment was improperly

terminated while two of his complaints were pending, <u>i.e.,</u> his complaint to the OAWP which

alleged retaliation and harassment, and his appeal to the MSPB challenging his termination

and which, for the first time, contained whistleblowing allegations.[13]  The AWPA provides in

relevant part:

> In the case of a covered individual who has made a whistleblower disclosure to the Assistant Secretary for Accountability and Whistleblower Protection, the Secretary may not remove, demote, or suspend such covered individual under subsection (a) until--
>
> (A) in the case in which the Assistant Secretary determines to refer the whistleblower disclosure under section 323(c)(1)(D) of this title to an office or other investigative entity, a final decision with respect to the whistleblower disclosure has been made by such office or other investigative entity; or
>
> (B) in the case in which the Assistant Secretary determines not to refer the whistleblower disclosure under such section, the Assistant Secretary makes such determination.

38 U.S.C. § 714(e)(2)(A) & (B).  It is Mr. King's contention that his termination was prohibited

by this statute since no decision had been made concerning his charges.  This argument is not

supported by the record.

The undisputed facts establish that on December 12, 2017, the VA contacted OAWP to

determine whether King had engaged in any activity which would require a hold on his

---

[13] The VA questions whether this claim is properly before the court in light of the procedural history of his appeal to the MSPB.  (<u>See</u> Def. Reply at 1-3).  In light of the confusing record, this court will address the merits of this claim.

proposed removal under 38 U.S.C. § 714(e).  (Works Decl. (Def. Reply Ex.) ¶ 6).[14]  The VA was

advised by the OAWP that there was no impediment to taking action on removal and that

OAWP had no objection under § 714(e)(2) to the VA proceeding with disciplinary action

against Mr. King.  (Id. ¶¶ 7-8).  Thus, the VA appropriately relied on OAWP in proceeding to

terminate Mr. King's employment.

Moreover, the advice given by OAWP is consistent with the (somewhat confusing)

record before this court.  Mr. King's timely complaint to the OAWP did not contain

whistleblowing allegations that would have made his complaint to the OAWP fall within the

purview of § 714(e).  Mr. King's subsequent appeal to the MSPB allegedly raised

whistleblowing allegations but was dismissed as untimely.  The OAWP eventually ruled

against Mr. King.  There is no support for the argument that Mr. King's termination was

prohibited by § 714(e).

### F.  Secretary McDonough is the Only Proper Party to this Action under Title VII

In their motion, the Defendants claim that defendants Mayes and Kvale should be

dismissed because they are not heads of their department, agency, or unit in which the

alleged discriminatory acts occurred.  Under Title VII, a plaintiff may maintain their claim only

against the head of the agency or department being sued.  See 42 U.S.C. § 2000e-16(c); Soto

v. United States Postal Service, 905 F.2d 537, 539 (1st Cir.1990) (discrimination cases brought

under Title VII against a federal agency may be brought only against the "head of the

---

[14] Although the record is silent on this matter, it appears that the VA would need to contact
OAWP because whistleblower complaints are confidential, and the VA may not independently know if
a complaint had been made.

department, agency, or unit").  Therefore, the claims against defendants Mayes and Kvale

should be dismissed for this reason as well.[15]

## IV.  **CONCLUSION**

For all the reasons detailed herein, the "Defendants' Motion for Summary Judgment"

(Docket No. 86) is ALLOWED.

/s / Judith Gail Dein
Judith Gail Dein
United States Magistrate Judge

---

[15] The court has considered all the arguments of the parties even if not specifically addressed herein.  The court declines to address the question of state law immunity raised by the Defendants because none of the counts of the complaint raise state law claims.  (See Def. Reply at 5).  In any event, such claims would fail on the merits for the reasons detailed herein.